**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **DONNA BOND,** | * | |
| | * | |
| | * | Civil No.   **PJM 15-699** |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| **U.S. POSTAL SERVICE FEDERAL** | * | |
| **CREDIT UNION,** | * | |
| | * | |
| Defendant. | * | |

## OPINION

Donna Bond (Bond) has sued the U.S. Postal Service Federal Credit Union (USPS-FCU), alleging violations of the Right to Financial Privacy Act (RFPA), 12 U.S.C. § 3401, *et seq.*, as well as a state tort claim for negligent infliction of emotional distress. The USPS-FCU has filed a Motion to Dismiss all counts. ECF No. 7. On August 3, 2015, the Court held a hearing on USPS-FCU's Motion. ECF No. 15. Bond subsequently moved for partial summary judgment. ECF No. 19. For the reasons that follow, USPS-FCU's Motion to Dismiss (ECF No. 7), which the Court treats as a Motion for Summary Judgment,[1] is **GRANTED**, and Bond's Motion for Partial Summary Judgment (ECF No. 19) is **DENIED**.

### I.   FACTS

The following facts are not in dispute:

---

[1] Following the August 3, 2015 hearing, USPS-FCU submitted the affidavit of Mary Giberson, Assistant Special Agent in Charge at the U.S. Postal Service Office of Inspector General, in support of its Motion to Dismiss. ECF No. 16. Bond filed a response, attaching her own affidavit. ECF No. 16. Given Giberson's affidavit, and the fact that Bond has had a reasonable opportunity to respond with her own affidavit, the Court will treat USPS-FCU's Motion to Dismiss as a Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 12(d). *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Bond worked as an Investigative Analyst for the U.S. Postal Service Office of Inspector General (USPS-OIG) at its Capital Heights Metro Area Field Office in Clinton, Maryland. Compl. ¶ 9, ECF No. 1. In January 2010, she and her direct supervisor, Assistant Special Agent in Charge Mary Giberson, opened in their own names a joint personal checking and savings account at USPS-FCU. The account, however, was intended to serve as a "Sunshine Fund" to pay for special events involving coworkers, including, for instance, birthday parties and weddings. *Id.*; Giberson Aff. ¶¶ 3-4, ECF No. 16. Deposits into the account came from their coworkers, although Bond and Giberson also deposited their own funds. Giberson Aff. ¶ 4. Bond and Giberson were the only employees authorized to make transactions in the account. *Id.* ¶¶ 3-4; *see also* Pl.'s Opp'n Summ. J., Bond Aff. ¶ 9, ECF No. 17-1.

In October 2013, Giberson had occasion to review a bank statement for the account, addressed jointly to her and to Bond, and noticed what she deemed to be questionable activity; several withdrawals and other transactions seemed out of the ordinary. Compl. ¶ 11; Giberson Aff. ¶ 5. Giberson suspected that Bond had made withdrawals to cover Bond's personal expenses. *See* Giberson Aff. ¶ 5. Accordingly, Giberson immediately began to investigate the account, speaking first to a representative for USPS-FCU, who gave her a copy of a check for the account and helped her obtain access to the online portal for the account. *Id.* ¶¶ 6-7. Giberson thereafter downloaded as many statements as she could from the portal, several of which suggested similarly questionable withdrawals, and communicated what she found to her supervisor, Luke Hall. *Id.* Giberson turned over to Hall the records she had obtained. *Id.*

Giberson also contacted Special Agent Michael Lamb of USPS-OIG, Special Inquiries Division, delivering to him account statements covering the period from November 2012 through September 2013. Compl. ¶ 11; Giberson Aff. ¶¶ 7-8. At the same time Giberson gave Lamb

verbal permission to seek further records of the account directly from USPS-FCU, including the remaining checks and statements needed to track the funds. Giberson Aff. ¶ 9.  Giberson, by affidavit, says she did this because she believed having Lamb obtain the records would save the cost she would incur if she herself returned to USPS-FCU and requested the records. *Id.*

On October 22, 2013, Lamb contacted a USPS-FCU employee, Don Jarboe, and requested account statements, checking account activity, and information concerning one or more deposits made to the joint account. Compl. ¶12. Giberson has stated on affidavit that these items were intended to supplement documents she herself had already delivered to Lamb. *See* Giberson Aff. ¶ 9. Jarboe and another USPS-FCU employee, Linda Striegel, thereafter provided Lamb with the requested financial records and account information. Compl. ¶ 12. They did so, however, without requiring either a subpoena or a written consent for the release of the records from either Giberson or Bond. *Id.*

On October 29, 2013, Lamb approached Bond in person and questioned her about specific transactions concerning the Sunshine Fund account. *Id.* ¶ 14.

From November 2013 through mid-February 2014, no further action was taken.

On February 12, 2014, however, Giberson handed Bond a proposed letter of removal, *id.* ¶ 18, stating that Giberson had reviewed Lamb's investigative report, had researched applicable policy, and was recommending Bond's "removal," or termination of employment with USPS-OIG, *see* Giberson Aff. ¶ 11. Bond responded to the proposed removal in March 2014. Compl. ¶ 18.

On April 17, 2014, Lamb made an additional request of USPS-FCU for financial records pertaining to the account, including copies of money orders and 16 personal checks that had been

deposited.[2] Def.'s Opp'n Mot. Partial Summ. J. ("Def.'s Opp'n"), Ex. A, ECF No. 22-1. The same USPS-FCU employees, Jarboe and Striegel, provided Lamb with the requested items. Compl. ¶ 20. Once again, however, they did so without a subpoena or without the written consent of either Giberson or Bond. *Id.* ¶¶ 19-20.

On May 27, 2014, Bond's employment was terminated by USPS-OIG. Compl. ¶ 20.

Giberson has confirmed by affidavit that, from the outset and before Lamb made any requests of USPS-FCU, she verbally consented to USPS-OIG and to Lamb, in particular, obtaining records from USPS-FCU for purposes of investigating the account. Giberson Aff. ¶ 10. Bond has never provided either verbal or written consent to release records to USPS-OIG, Bond Aff. ¶¶ 5, and, indeed, she bases her claims against USPS-FCU in this suit on Lamb's failure to obtain her written consent or at least secure a subpoena before transmitting the account records.

On March 12, 2015, Bond filed her Complaint against USPS-FCU in this Court. Count I alleges that USPS-FCU violated the RFPA when it disclosed financial records to Special Agent Lamb on October 22, 2013, without requiring either a subpoena or written authorization by Bond, and without certifying compliance with the RFPA. In Count II, she alleges that USPS-FCU violated the RFPA when it disclosed further records to Agent Lamb under similar circumstances on April 17, 2014. In Count III, Bond seeks punitive damages for alleged intentional and willful violations of the RFPA.[3] In Count IV, she seeks damages for negligent infliction of emotional distress.

---

[2] Bond asserts in her Complaint that Lamb's second request for Sunshine Fund account records was made on April 15, 2014. Compl. ¶ 19. However, Lamb's letter to Jarboe requesting the records, attached as an Exhibit to USPS-FCU's Opposition to Bond's Motion for Partial Summary Judgment, indicates that the request was made on April 17, 2014. Def.'s Opp'n Mot. Partial Summ. J., Ex. A, ECF No. 22-1. The difference in these dates is immaterial for present purposes.

[3] Punitive damages are not properly pled as a separate count. As this Court has previously explained, "[t]here is no separate cause of action for punitive damages apart from an underlying cause of action upon which punitive damages can be grounded." *Biggs v. Eaglewood Mortgage, LLC*, 582 F. Supp. 2d 707,

USPS-FCU has moved to dismiss and/or for summary judgment on Counts I, II, III, and IV. Bond has moved for partial summary judgment as to Counts I and II.

## II.     STANDARD OF REVIEW

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This does not mean, however, that "*some* alleged factual dispute between the parties" defeats the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, "the requirement is that there be no *genuine* issue of *material* fact." *Id.* (emphasis in original). Further, "[a] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (internal quotation and citation omitted). The court may thus grant the motion when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." *Anderson*, 477 U.S. at 247 (quoting Fed. R. Civ. P. 56(c)).

## III.    RIGHT TO FINANCIAL PRIVACY ACT CLAIMS

### A. The Right to Financial Privacy Act

Under the RFPA, a financial institution may not "provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer" unless certain procedures are followed or certain exceptions under the statute apply. *See* 12

---

711 n.5 (D. Md. 2008). However, for purposes of the discussion below, the Court will address the merits of the punitive damages claims as though they had been properly pled.

U.S.C. § 3403(a); *see also* 12 U.S.C. §§ 3405-08 (specifying the procedures that should be followed). Government authorities and financial institutions found in violation of the Act can be held liable for (1) $100 in statutory damages, (2) actual damages, (3) punitive damages where the violation was willful or intentional, and (4) attorney's fees. 12 U.S.C. § 3417. Congress passed the RFPA in response to the Supreme Court's decision in *United States v. Miller*, 425 U.S. 435 (1976), which held that the customer of a financial institution has no Fourth Amendment expectation of privacy in the records of personal accounts. *See Duncan v. Belcher*, 813 F.2d 1335, 1337 (1987) (discussing the legislative history of the RFPA). Any assessment of alleged violations under the RFPA must therefore be cognizant of the motivating purpose of the Act, i.e., to protect bank customers' privacy.

### B. The Parties' Arguments

USPS-FCU makes several arguments disputing its liability under the RFPA.

It first argues that the RFPA does not apply to the Sunshine Fund disclosures at issue because Bond is not a "customer" within the meaning of 12 U.S.C. § 3401(5). *See* Def.'s Mem. Supp. Mot. Dismiss ("Def.'s Mot. Dismiss") 4-5, ECF No. 7-1. According to USPS-FCU, Bond is merely a nominal holder of the account, which was universally understood to be a "Sunshine Fund," and which therefore should be treated as an account of USPS-OIG because it was created specifically to benefit USPS-OIG employees, not to benefit of one of the nominal account holders. *See id.* Since, says USPS-FCU, USPS-OIG, the de facto "customer" of the account, is the government entity that requested the account information from USPS-FCU, there could be no RFPA violation. *See id.* Bond counters that, because the Sunshine Fund was opened as a personal bank account in her and Giberson's names, she is in fact a "customer" under the RFPA. There

6

was nothing on the face of the account, she argues, to suggest that it was anything other than a personal account held by two individuals. *See* Pl's. Opp'n Mot. Dismiss 4-8, ECF No. 9.

USPS-FCU next argues that Bond cannot show a causal connection between her alleged damages – emotional distress and the financial losses she claims as a result of her termination – and the purportedly unlawful disclosures made here. *See* Def.'s Mot. Dismiss 6-7. Bond responds that, despite the fact that she was questioned about the Sunshine Fund account in October 2013, she did not have sufficient notice of the investigation, such that she might have been in a position to resign prior to receiving the proposed letter of removal in February 2014 and her official termination in May 2014. *See* Pl.'s Opp'n Mot. Dismiss 11-13.

Finally, USPS-FCU points to the unique circumstances of this case—most especially the fact that it was Giberson, joint holder of the account, who, after reviewing a bank statement properly addressed to her, initiated the investigation after noticing suspicious, possibly improper conduct on the account. USPS-FCU takes the position that, although Giberson's consent prior to the actual delivery of account documents may have been oral, she has subsequently confirmed by written affidavit that, in advance of Lamb's two requests for records, she did in fact give her consent. *See* Def.'s Opp'n 8. In her own Motion for Partial Summary Judgment, Bond submits that these unique factual circumstances are immaterial. Pl.'s Mem. Supp. Mot. Partial Summ. J. ("Pl.'s Mot. Partial Summ. J.") 3-5, ECF No. 19-1. Her position is that for USPS-FCU to make disclosures to USPS-OIG required either a subpoena, a certificate of compliance, or the written consent of *both* account holders. *Id.*; *see also* Pl.'s Opp'n Summ. J. 5-6, ECF No. 17. Bond submits that the oral authorization of only one account holder, Giberson, cannot suffice to shield USPS-FCU from liability under the RFPA.

7

## C. Analysis

The Court need not consider whether Bond was in fact a "customer" of the account. Assuming arguendo that she was – even though the matter is highly debatable – the Court finds USPS-FCU's latter two arguments sufficiently persuasive to justify summary judgment in favor of USPS-FCU on Counts I, II, and III.

### 1)  Waiver of the RFPA

The undisputed facts indicate that any requirements under the RFPA of written customer authorization or of obtaining a subpoena with customer notice were effectively waived.

It is a fundamental proposition that an individual may waive his or her privacy interests by, for example, consenting, even verbally, to a search by the Government. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) ("[A] search authorized by consent is wholly valid."); *United States v. Seidman*, 156 F.3d 542, 549 n.10 (4th Cir. 1998) ("Consent has often been recognized as sufficient to waive Fourth Amendment rights."). Similarly, enforcement of certain statutory private rights of action can be waived by prospective plaintiffs, even in areas in which constitutionally-guaranteed rights are at stake. *See generally Town of Newton v. Rumery*, 480 U.S. 386 (holding that the right to bring a civil rights claim under 42 U.S.C. § 1983 could be voluntarily waived in agreement between prosecutor and criminal defendant); *United States v. Purdue Pharma L.P.*, 600 F.3d 319 (4th Cir. 2010) (holding that release of claims under the False Claims Act was not *per se* invalid). There is no reason why the same rationale should not apply with respect to the RFPA. The RFPA establishes a statutory right of privacy concerning certain records maintained by a financial institution, but nothing in the Act precludes the ability of a customer to waive its requirements either at the time of or after a disclosure.[4] Though other

---

[4] Notably, the RFPA bars a financial institution from requiring customers to prospectively authorize disclosures as a condition of doing business. *See* 12 U.S.C. § 3404(b). This provision, however, does not

courts have not directly addressed this issue,[5] the Court concludes that liability for non-compliance with the RFPA can indeed be waived, especially where a "customer," in this case one of the two named joint account holders, unambiguously consents to the disclosure. In such a circumstance, the public policy concerns underlying the RFPA – maintaining the privacy of one's financial records – are not jeopardized, in as much as the "customer" him- or herself has willingly decided to abandon those privacy interests and protections.

It is critical to note that it was not the Government that initiated the Sunshine Fund investigation. Instead, Giberson, one of the named joint-account holders, approached the Government because, having reviewed statements addressed to her (and, to be sure, to Bond as well), was suspicious that her co-account holder was essentially using money of coworkers to cover personal expenses. Not only did Giberson consent to the disclosures to USPS-OIG; she requested that they be made and helped to facilitate them when her superiors became involved. Giberson's consent to the release of records, albeit verbal, was clear, and has indeed been confirmed by written affidavit submitted to the Court after-the-fact. The Court finds that co-account holder Giberson's initiation of the investigation, her personal role in turning over the records to USPS-OIG, and her express verbal authorization in advance for the release of additional Sunshine Fund records, constituted a waiver of any past or present claim for liability under the RFPA related to the October and April disclosures at issue in Counts I, II, and III of the Complaint.

---

preclude a customer from voluntarily and based on his or her own decision waiving the requirements of the Act. Indeed, the statutory provision does not address the situation in which express waiver of the RFPA occurs, either at the time of or after a particular disclosure.

[5] The Court is aware of only one federal case addressing waiver under the RFPA. In *Flowers v. First Hawaiian Bank*, the Ninth Circuit held that a claimant had not as a matter of fact waived his right to file a complaint under the RFPA simply because he had notice of a government subpoena and did not object before his bank records were produced. 295 F.3d 966, 975 n.2 (9th Cir. 2002). In reaching this holding, the Ninth Circuit appears to have assumed without deciding that the RFPA could in some circumstances be waived.

But, Bond argues, Giberson, as only one of two account holders, was not authorized to give consent to access the joint account. In the absence of a subpoena, she says, both Bond and Giberson were required to consent. The Court is unpersuaded. This argument goes against the very concept of joint tenancy, pursuant to which, generally speaking, either joint tenant may have full access to and use of the account without permission or indeed even the knowledge of the other joint tenant. *See Chambers v. Cardinal*, 177 Md. App. 418, 424-25, 935 A.2d 502, 506 (2007) ("In a joint tenancy, each tenant 'owns an undivided share in the whole estate, has an equal right to possess, use, and enjoy the property, and has the right of survivorship.'") (*quoting Downing v. Downing*, 326 Md. 468, 474, 606 A.2d 208, 211 (1992)); *see also Haller v. White*, 228 Md. 505, 509, 180 A.2d 689, 692 (1962) (noting the legal presumption that establishing a bank account with two named account holders creates a joint tenancy). The customer agreement governing the Sunshine Fund account ("Agreement") puts to rest any suggestion that Bond had to consent to the waiver by Giberson. The Agreement states in pertinent part: "Each joint account owner, without the consent of any other account owner, may, and hereby is authorized by every other joint owner to make any transaction permitted under this Agreement." Def.'s Opp'n, Ex. B.[6]

Further, as a policy matter, requiring dual consent in circumstances such as these would be intolerable. It would empower one tenant on a joint account, whose use of the funds in the account might be outright illegal, to unilaterally block the other joint tenant's efforts to investigate transactions in the account or to disclose them to the Government for further investigation.

---

[6] In her affidavit, Bond states that she "was never provided with any specific rules concerning the handling of the account." Bond Aff. ¶ 7. Apart from this too facile, hard to credit argument, whether or not Bond was expressly handed a copy of the Agreement, she should have been aware that her joint account holder could make autonomous decisions regarding the account independently of her.

The Court concludes that authorization by one joint bank account holder to a financial institution to disclose records of the account to a Government investigator absolves the financial institution of any liability under the RFPA.

Finally, there is the matter of whether the consent must be in writing or whether the writing may in fact be furnished after-the-fact. While it is true that, generally speaking, an authorization to release records under the RFPA must be in writing and must comply with certain enumerated requirements, *see* 12 U.S.C. § 3404, the lack of such a writing – in light of the unusual scenario giving rise to the dispute in this case – is immaterial. As stated above, all of the RFPA's requirements for access – including its requirement of a written authorization under § 12 U.S.C. § 3404 – were waived by co-account holder Giberson's involvement in the investigation and by her verbal consent to the release of records.

The Court acknowledges the Fourth Circuit's holding in *Duncan v. Belcher*, in which the court reversed a district court's decision that a customer had "impliedly authorized" disclosures related to his charge card account by ordering an audit of certain program expenditures related to his employment. 813 F.2d at 1339. In the context of that case, the Fourth Circuit stated that the RFPA "does allow the government to obtain records with the customer's consent, but only by a 'signed and dated statement' that recites the nature of the records, the purposes of disclosure, the customer's rights and other information." *Id.* Even so, while 12 U.S.C. § 3404 may preclude a claim of implied consent where the sole account holder disputes the implication, *Duncan* did not address the situation where, as here, one of the two joint account holders herself has initiated the release of records from the account, and has then indisputably authorized the financial institution to provide additional records to the Government—records which the joint account holder could

11

have obtained and provided to USPS-OIG herself. Under the circumstances, the fact that Giberson's written consent came after-the-fact does not affect the Court's decision.[7]

For these reasons, Bond's arguments stemming from the October and April disclosures fail because the RFPA was effectively waived by Giberson. USPS-FCU is entitled to summary judgment on Counts I, II, and III.

### 2) Liability for Actual, Statutory, and Punitive Damages under the RFPA

Even if the requirements of the RFPA were applicable to the October 2013 and April 2014 disclosures at issue, the Court concludes as a matter of law that Bond cannot plausibly show actual, punitive, or statutory damages as a result of USPS-FCU's allegedly unauthorized actions.[8]

#### a. Actual Damages

In order to demonstrate that she suffered actual damages under the RFPA, Bond must causally connect the disclosures at issue to the losses she suffered. *See Flowers v. First Hawaiian Bank*, 295 F. Supp. 2d 1130, 1140 (D. Haw. 2003) *aff'd sub nom. Flowers v. U.S. Army, 25th Infantry Div.*, 179 F. App'x 986 (9th Cir. 2006); *see also Suburban Trust Co. v. Waller*, 408 A.2d 758, 765-66 (Md. App. 1979). If, for example, as a result of unauthorized disclosures, she had sustained identity theft or other tangible adverse financial consequences, actual damages might be cognizable under the RFPA. *See, e.g.*, *Flowers*, 295 F. Supp. 2d at 1140.

---

[7] The Court does not intend to minimize the importance of following the procedures set forth in the RFPA for the release of financial records to the Government. Most certainly, in the future, USPS-FCU and USPS-OIG would be well-advised to obtain records in a manner more precisely in compliance with the statute than they did in the present case.

[8] In her Reply to USPS-FCU's Opposition to Motion for Partial Summary Judgment, Bond clarifies that she claims actual damages only in relation to the October 22, 2013 disclosure (Count I), and punitive damages only in relation to the April 17, 2014 disclosure (Count II). *Id.* at 10. As noted above, punitive damages should not have been alleged as a separate count (Count III). Since the Court finds that all the damages claims are without merit as a matter of law, there is no need for Bond to re-plead them in an amended complaint.

But Bond pleads nothing of the sort.

Notably, she does not challenge in any way that the records that were disclosed indicated that she had inappropriately used the Sunshine Fund account for personal purposes. Rather, she argues that, had proper procedures been followed under the RFPA when USPS-OIG made its first records request on October 22, 2013, she would have received notice of Agent Lamb's request and could have resigned from her job without incurring a black mark on her employment record—as opposed to being terminated based on a negative disciplinary finding. *See* Pl.'s Opp'n Mot. Dismiss 11-13. Bond asserts that her firing has hindered her future job prospects and has also caused her emotional distress. *Id.*

Bond's attempt to link the purportedly unauthorized disclosure in October 2013 to her unfavorable termination of employment and her emotional sequelae is without merit. There is simply no cognizable causal nexus between USPS-FCU's allegedly unauthorized disclosures and Bond's lost opportunity to resign instead of being terminated.

Agent Lamb questioned Bond concerning the transactions pertaining to the Sunshine Fund account in October 2013. It was not until five months later that she was issued a proposed letter of removal. The October meeting clearly put Bond on notice that USPS-OIG was looking into her account and questioning the propriety of her actions with respect to it. At any point in that five-month interval, Bond could have resigned. That she chose not to do so, as much as anything else, appears to have been simply a hope against hope.

Bond nevertheless says that every day that she remained on the job made it easier for her to believe that she would remain on the job. Pl.'s Opp'n Mot. Dismiss 12. This argument is puzzling. At best, essentially, Bond is claiming she was misled by USPS-OIG because it did not act quickly enough to dismiss her. Bond, the perpetrator, in effect wraps herself in the clothing of

victim. But again, it was her own five months of inaction upon learning of the USPS-OIG investigation that "deprived" her of her ability to resign, not any failure by USPS-OIG to tell her promptly that she was going to be terminated.

Most importantly, there is simply no basis to assume that, even had Bond attempted to resign in advance of the unfavorable termination letter, USPS-OIG would have permitted her to do so without making either a disciplinary finding or without creating a record of what appeared to be her serious mishandling of the Sunshine Fund. As Bond's subsequent potential employers might come calling with inquiries about Bond's performance as an employee, why should it be assumed that USPS-OIG would say nary a word about Bond's questionable conduct with respect to the USPS-FCU account?

Bond's claim for emotional damages fares no better. It is doubtful that "actual damages" under the RFPA would include non-pecuniary damages for emotional harms such as humiliation and mental anguish.[9] In any event, the Court holds that emotional damages cannot be recovered under the RFPA in the absence of demonstrable pecuniary losses, as is the case here. See *Neece v. I.R.S. of U.S.*, 41 F.3d 1396, 1399 (10th Cir. 1994) (affirming district court denial of award for emotional damages under the RFPA when plaintiffs failed to prove any "compensable nonpecuniary losses").

---

[9] In the context of actions brought under the somewhat analogous Privacy Act, 5 U.S.C. § 552, *et seq.*, which prohibits disclosure of certain records by a Government agency without the consent of the individual to whom the record pertains, courts of appeals are divided on the issue of whether recovery for "actual damages" includes emotional harms. *Compare Fitzpatrick v. Internal Revenue Serv.*, 665 F.2d 327, 331 (11th Cir. 1982) *abrogated on other grounds by Doe v. Chao*, 540 U.S. 614, 124 S. Ct. 1204, 157 L. Ed. 2d 1122 (2004), *with Johnson v. Dep't of Treasury, I.R.S.*, 700 F.2d 971, 977 (5th Cir. 1983) *abrogated on other grounds by Doe v. Chao*, 540 U.S. 614. Both the Supreme Court and Fourth Circuit have left this question open. *Doe v. Chao*, 540 U.S. at 627 n.12; *Doe v. Chao*, 306 F.3d 170, 181 (4th Cir. 2002) *aff'd*, 540 U.S. 614, 124 S. Ct. 1204, 157 L. Ed. 2d 1122 (2004). Since the "actual damages" question in relation to the Privacy Act remains unsettled, and without precise guidance from other courts on the question as applied to the RFPA, the Court will forego reaching a definitive holding on the scope of "actual damages" under 12 U.S.C. § 3417(a)(2) at this time.

### b. Punitive Damages

Similarly meritless is Bond's claim for punitive damages in Count III, linked to the April disclosure alleged in Count II of her Complaint. *See* Pl.'s Reply Opp'n Mot. Partial Summ. J. ("Pl.'s Reply") 10, ECF No. 23. Of course, before reaching the issue of punitive damages, an underlying violation of the RFPA must be found. Over and above that, an award of punitive damages requires a showing that the defendant *intentionally and willfully* violated the RFPA. 12 U.S.C. § 3417. This means more than gross negligence. One court has described the required showing as actions "so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful." *See Taylor v. Dep't of Air Force*, 18 F. Supp. 2d 1184, 1192 (D. Colo. 1998) *aff'd sub nom. Taylor v. U.S. Air Force*, 176 F.3d 489 (10th Cir. 1999) (internal quotation and citation omitted).

Assuming, for the sake of argument, that USPS-FCU violated the RFPA in April 2014, the facts fall far short of showing conduct on USPS-FCU's part that was "intentional and willful." In handing over the financial records at issue, USPS-FCU employees were responding to requests (1) initiated by one of its named account holders, (2) involving an account that arguably could have been considered the account of USPS-OIG itself, rather than the persons named to administer it. Punitive damages have no place in this proceeding.

### c. Statutory Damages

The Court finds further that Bond has no basis for recovery of statutory damages with respect to Counts I and II– a total of $200 in this particular case ($100 per alleged violation). The Sunshine Fund account was opened in both Bond's name and Giberson's name, but the account in fact held funds from several co-workers. Assuming arguendo improper access to the account by USPS-OIG, there is no reason why Bond should be recognized as the sole victim, hence the

15

only one entitled to full statutory damages. Indisputably, she was not the only person with an interest in the Sunshine Fund account, yet neither Giberson, the joint tenant on the account, nor any other depositor, has brought a claim for statutory damages against USPS-FCU.

Bond's failure to demonstrate cognizable actual, emotional, punitive, or statutory damages further confirms the Court's grant of summary judgment in favor of USPS-FCU with respect to the RFPA claims—Counts I, II, and III of Bond's Complaint.

## IV. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM

Bond's attempt to seek recovery for emotional distress, economic losses, and other damages based on negligent infliction of emotional distress is easily dispatched. "Maryland does not recognize an independent tort for negligent infliction of emotional distress." *Miller v. Bristol-Myers Squibb Co.*, 121 F. Supp. 2d 831, 839 (D. Md. 2000) (citing *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 482, 665 A.2d 297, 303 (1995)).

Permitting Bond to amend her Complaint to allege intentional infliction of emotional distress would not change the result. Intentional infliction of emotional distress requires a showing that: (1) the conduct was intentional or reckless; (2) the conduct was both extreme and outrageous; (3) there is a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Hamilton v. Ford Motor Credit Co.*, 66 Md. App. 46, 58, 502 A.2d 1057, 1063 (1986).

As discussed previously, none of these elements is in any way supported by the undisputed facts here.

USPS-FCU is entitled to summary judgment on Count IV as well.[10]

---

[10] In light of the foregoing, Bond's Motion for Partial Summary Judgment will be **DENIED**.

## V.   CONCLUSION

For the foregoing reasons, USPS-FCU's Motion to Dismiss (ECF No. 7), treated as a Motion for Summary Judgment, is **GRANTED** as to Counts I, II, III, and IV of Bond's Complaint, and Bond's Motion for Partial Summary Judgment (ECF No. 19) is **DENIED**. This case is therefore **CLOSED**.

A separate Order will **ISSUE**.

**December 9, 2015**

/s/
**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**